1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DENNIS MAINS,                                No.  14-cv-0504-JAM-EFB-P

12                  Petitioner,

13          vs.

14   JOE A. LIZARRAGA, Warden,                     FINDINGS AND RECOMMENDATIONS

15                  Respondent.

16

17          Petitioner is a state prisoner proceeding without counsel with a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a judgment of conviction entered

19   against him in 2011 in the Sacramento Superior Court on charges of first degree murder with use

20   of a gun.  He also challenges his sentence of fifty years-to-life in state prison.  Petitioner seeks

21   federal habeas relief on the following grounds: (1) the trial court violated his federal

22   constitutional rights in excluding evidence at his trial (2) his sentence is unlawful; and (3) this

23   court should maintain copies of filed documents and send documents to him.  Upon careful

24   consideration of the record and the applicable law, the undersigned recommends that petitioner's

25   application for habeas corpus relief be denied.

26   /////

27   /////

28   /////

                                                  1

**I. Background**

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> A jury found defendant Dennis Robert Mains guilty of first degree murder, during which he personally used a gun. It then found he was sane at the time of the crime. The trial court sentenced him to state prison for the prescribed term.

> Indisputably guilty of the act of homicide, defendant attempts to find reversible error in connection with his proffered defenses of provocation from the victim and his purportedly psychotic state of mind. To this end, he challenges the trial court's refusal to instruct on mistake of fact stemming from medicinally induced hallucinations; its failure to instruct on the elements of second degree murder; its failure to allow consideration of voluntary intoxication in connection with the subjective mental states involved in the elements of provocation or imperfect self-defense; and its refusal to admit evidence bolstering his testimony that he thought the victim was poisoning him and had behaved violently toward him. He also contends the trial court erred when it failed to grant a continuance after the prosecution provided a large amount of discovery on the eve of trial. We shall affirm the judgment.

> **FACTUAL BACKGROUND**

> Defendant and the victim met in 1995. They were married three months later. It was a tempestuous relationship. The victim left defendant four times between 1998 and 2006, but each time they reunited.

> Defendant testified that the victim had tried to stab him three times over the years (reporting one of these incidents to his daughter). He also asserted that the victim had tried to kill her previous husband with a gun. On the other hand, a friend had observed the victim with physical injuries on three occasions, which the victim attributed to defendant (a claim defendant denied at trial). The victim's brother had also noticed bruising on the victim, and warned defendant against doing anything like that to her again.

> Both defendant and the victim obtained restraining orders against the other at different times. During one of their separations, defendant reported a violation of the restraining order against the victim to the police; he repeatedly said to the officer that he was afraid of the victim because she had previously threatened to kill him and could obtain a gun,[1] and he had learned someone was trying to locate him (even though he had not seen the victim in

---

[1]   The victim's brother had helped her move during one of the periodic separations. He saw a gun among her possessions, which another sibling unloaded.

several months, who was in Arizona).  Although unable to contact the victim, the responding officer filed a report pursuant to a city protocol with respect to restraining orders.

Defendant testified that the victim was verbally abusive, and he shared with his daughter his belief in the victim's ongoing infidelity.  He also testified that between 2005 and 2008, he had awakened four times to find the victim was spraying him with an arachnicide, and he once caught her pouring something from a small bottle into his milk container.  He had told "seventeen different people" about the poisonings, including his daughter.  Defendant sought hospitalization a dozen or so times for various physical and mental problems in the years preceding the murder.  In his view, these were a result of the dosings with the arachnicide.  His ailments included a "nervous breakdown," paranoia, hallucinations, panic, nausea, vomiting, headaches, and profuse sweating.  However, he never told anyone at a hospital about the poisonings because he would be rendered homeless if the victim were arrested.  He also testified that he had tried several times to kill himself.  At trial, he said his present medications mostly abated the hallucinations, but it was hard for him to focus.

A doctor testified that she had treated defendant during a hospital stay for sedative withdrawal in April 2007, when he appeared confused, agitated, anxious, and short-breathed, and reported chest pains and hallucinations.  His stay was a week long.  She prescribed an antipsychotic, though strictly as an additional sedative – she did not believe defendant's claims of hallucinations.

An emergency room (ER) doctor testified that he had twice treated defendant, in April and December of 2007.  Defendant reported his belief in the first ER visit that a catheter had not been removed from his arm after a previous hospital visit, and asserted that he was having hallucinations.  Defendant also claimed to have a history of schizophrenia.  On the second occasion, defendant reported having chest pains (along with other physical ailments).  The ER doctor did not find any foreign body present during the first visit, and all cardiac tests appeared normal on the second.  At the time, defendant had prescriptions for a sedative and a high blood pressure medication.  A sedative overdose could lead to lethargy and confusion, but the doctor had not seen any signs of this.  Sedative withdrawal could have led to the symptoms defendant reported on the second occasion.

In 2006, the victim and defendant had moved into a studio behind a house that the victim's daughter was renting.  In March 2008, the victim filed for divorce, and intended to move elsewhere with her daughter.  The daughter testified defendant refused to execute the dissolution agreement unless he was paid $5,000; the daughter paid him $3,000 and he signed the documents.  However, he did not move out as he had promised to do.  Defendant explained at trial that he had signed the documents only under threat of being put out on the street, ill and without any assets.  Defendant then bought a gun with some of the money he had received.  He testified that he needed it because he was in fear of the victim's family, who had

3

been threatening him.  (In his interview with the police, however, he had claimed he bought it for purposes of suicide.)

In April 2008, after inpatient treatment for mental health issues (apparently after a suicide attempt), defendant was referred to a halfway house clinic called T–Corps to help him transition to outpatient treatment for his depression.  A physician's assistant (PA) specializing in psychiatry who worked there testified that only a person with a severe mental health problem would be referred to T–Corps.  The PA met with defendant on April 22.  The PA diagnosed defendant as having severe recurrent depression with psychotic features, and generalized anxiety disorder.  The PA based this on defendant's report of episodes of depression and anxiety over the years, arising out of his difficulty with relationships (having been married six times) and his vague claims of auditory hallucinations over the past 18 months (which is actually a symptom more characteristic of schizophrenics who experience an onset of their disorder as young adults).  Defendant appeared properly oriented to reality during the evaluation.  Defendant also told the PA that he was afraid of the victim's family, who were dangerous people who might hurt him.  Defendant again did not say anything at T–Corps about the victim poisoning him.  Defendant seemed overwhelmed with grief over the loss of his marriage and his home.  The PA changed the type of sedative prescribed for defendant, because defendant did not feel it was working and patients develop a tolerance for sedatives.  Side effects of the new sedative could include a lowering of inhibitions, a paradoxical increase in anxiety, and drowsiness.  However, hallucinations or psychosis are not listed among the typical adverse reactions from use of the drug (as opposed to an abrupt withdrawal from its use).  The prescription limited defendant to two milligrams once per day for the first three days, then twice a day thereafter.  Defendant mentioned having a history of abusing sedatives over the previous 15 years.

Defendant began taking the new sedative the next day.  He took twice as much as prescribed.  At trial, he asserted that the medication made it hard to control his emotions and made him feel aggressive.  He also began to experience hallucinations.

Defendant visited a longtime friend on April 24.  The friend testified defendant was distraught about the divorce; he complained about the victim being physically and verbally abusive, and may have mentioned his belief that she had been poisoning him.  He also shared his fears about her family menacing him.  Defendant said he was upset that the victim would be living in a nice house while he would be near homeless.  Defendant made vague allusions to having hallucinations.

A T–Corps mental health worker assisting in defendant's case management met with him later that day to discuss housing.  The T–Corps worker had done intake work with defendant in early April, and had been present during the PA's evaluation of him two days earlier.  Defendant's mood seemed to have improved, and

4

defendant told him that the new medication made him feel better without upsetting his stomach.

At trial, defendant said he had taken two more of the sedatives on April 24 and had been feeling okay during the day when visiting with his friend (and presumably during his meeting with the T–Corps worker), but his hallucinations got worse that evening. He thought the victim looked like a black blob, and then a frog, sitting on the bed.

The following morning, the hallucinations were worse and defendant felt shaky. Objects appeared to be melting and flying through the air; the floor rose, and a tuba appeared (playing visible musical notes). Defendant heard a deep voice saying, "break the curse." He had been hearing this phrase for a couple of months, and believed it was referring to the need for him to die.[2] He nonetheless took another sedative.

Defendant and the victim began to argue. She had learned defendant was responsible for reporting her out-of-town son to a local police department as a danger to himself or others, which resulted in the revocation of her son's parole and his return to prison for another 12 years. The victim was furious, and said she and her family would kill both defendant and his daughter.

Defendant left for the store to allow the victim to cool off, but returned because he had forgotten his wallet. The argument resumed, and he took another sedative at some point. The victim went into another room and came back with a knife, charging at him. Defendant fled for the store.

On his return, defendant first looked in through the window to determine if the victim was near the door with a knife. As a part of his hallucination, the surroundings suddenly went dark. He heard the victim shouting that she was going to kill him. She was lying awake in the bed. Defendant went into the bathroom, which suddenly lightened. He grabbed his gun and went back into the other room, which was still pitch dark in his hallucination. The voice resumed its chant of "break the curse," though these references to his need to die did not make sense to him. He saw trees on fire "on the left-hand side." The victim was now asleep. Her face began to glow in the darkness. Defendant turned around to put the gun back in the bathroom. He heard a growl. When he turned back, there was a black wolf bleeding from its mouth in the bed. As this was an embodiment of evil, he was going to shoot it. However, he paused when it turned into a lamb. The vision toggled again between wolf and lamb. When it turned back into the wolf for the third time, defendant fired the gun twice at it because "the evil of the wolf was going to kill [him]," which was the evil in his wife that had behaved badly toward him and desired his death for

---

[2]   In his police interview, defendant had said he interpreted the phrase as referring to the victim. At trial, he explained this was one of the lies he told in order to "[get] a needle in [his] arm and . . . put [him] to sleep" because he wanted to die.

what he had done to her son and for other reasons.  He was aware that he was shooting at his wife and not a wolf.  At that point, he grasped that he was in the midst of a hallucination and "woke up staring at the wall"; when he saw his wife, he became conscious of what he had done and "went into hysterics."

Defendant testified that he took 170 of his blood pressure pills and 22 of his sedatives to kill himself.  He left a suicide note for his daughter in which he expressed his anger about being left on the street, sick and alone.  He called his friend to tell him what he had done, and warned the friend not to call the police or he would shoot himself.  After defendant hung up, the friend nonetheless called the police.  In the meantime, defendant called 911 to report that he was committing suicide after having shot his wife.  He mentioned he and his wife had been in an argument, which had been building over the last week about her divorcing him and forcing him onto the streets, and he was frustrated.

The victim was shot twice in the head.  Although she still showed signs of life when police arrived, she died during the administration of first aid.

An officer sat with defendant at the hospital.  Defendant did not complain of any auditory or visual hallucinations, or state that he was suffering the effects of poisoning.   He did not appear unresponsive to his surroundings.

The ER doctor who evaluated defendant for a medical clearance before release into police custody did not find any signs of a drug overdose.  Defendant's vital signs, including his blood pressure, were normal.  As a precaution, the doctor ordered charcoal therapy (which defendant refused to swallow voluntarily).  The doctor had treated defendant twice before in 2007 for claims of chest pain, which the doctor thought might be attributable to sedative withdrawal.  Defendant did not on either occasion complain of hallucinations.  While the doctor believed that an overdose of the sedative could cause some people to hallucinate, he did not observe defendant manifest any signs of psychosis during the latter's six hours at the hospital. Defendant also did not say anything about being poisoned.

After his release from the hospital that afternoon, defendant agreed to a police interview after an explanation of his rights.  Defendant appeared to be coherent, and acknowledged at trial that he was lucid during the interview.  He again did not mention anything about being poisoned, or the assault with the knife before the murder, or the wolf/lamb hallucinations about which he testified at trial.[3]  He did talk generally about having an 18–month history of auditory hallucinations (hearing radio stations and the curse-ending

---

[3]  At trial, defendant explained he omitted the former details because he felt suicidal and indifferent to the outcome of the investigation, declaring that he did not want to drag his wife "through the mud" as a result.  As for the latter, he did not think the interviewer would believe him.

voice, which he told the police had also been urging him "to do it"), visual hallucinations (moving objects, colors) and his nervous breakdown. He explained to the police that he had not told anyone else about the voices because he did not want to be committed. In response to defendant's claim of being psychotic, the police interviewer told defendant he did not behave like the psychotic people the interviewer had questioned over the years.

Defendant discussed the abusive behavior of his wife and her family toward him, including his coerced agreement to a divorce under the duress of his straitened financial circumstances and illness, and her unfaithfulness. His police account did not include the antecedent argument about the victim's son or mention the victim's knife-brandishing. Defendant simply asserted that he had heard the voices that morning, and shot her while she slept because he could not fight them off any longer. When asked why he would say hateful things about the victim in the suicide note, defendant said she did not care if he was left on the street after the divorce (where he knew he would die), and acknowledged being angry at her for not returning his affections and forcing him to move into a boarding house. He said that he had not told the T–Corps worker on the previous day about voices wanting him to kill his wife because he did not want to be "taken in" and thought he could handle his condition on his own. Although the record is unclear on this precise point, an officer testified that defendant had some sort of seizure that required medical attention after the conclusion of the interview.

Another longtime friend (who is a criminal defense attorney) went to the jail to visit defendant a week after his arrest (at which point defendant was apparently in the psychiatric unit). The friend testified defendant seemed depressed and ill at ease at his presence. He recalled that defendant had mentioned something about seeing a wolf face on the victim.[4] Defendant could not remember at trial what they had talked about. Indeed, he asserted that he had not told anybody about seeing the wolf because it was not "necessary."

Defendant's daughter testified that defendant, who had been in the jewelry business, told her he had inhaled a great deal of jewelry cleaner, which caused him "to think funny things." She recalled him telling her about the victim's trying to stab him, and complaining about the victim's infidelities. She thought he was a teller of absurd tales to which she generally paid little attention, such as his belief in time travel. He had lived with her for a period of time before she moved; she told him he could not come with her, at which point he returned to live with the victim. She described him as someone who preferred living with someone else to take care of him rather than get a job.

---

[4]   Contrary to the account of this testimony in defendant's briefing on appeal, the attorney did not testify that defendant told him "he had only fired his gun because he . . . saw a wolf." The exact snippets of testimony are "He did say something about, um, seeing a face, a wolf face or something like that" and "he was talking about seeing a wolf face on her," without any reference to this being the cause of the shooting.

A forensic psychologist conducted an evaluation of defendant in February 2009. He found defendant's account of the shooting to be "fantastic," because it was not consistent with the manner in which a person genuinely in the throes of psychosis or hallucinations would describe them. In the first place, visual hallucinations are "quite rare." What defendant described was more in line with the "vivid" and "movie-like" visions that psychedelic drugs induce. His description of auditory hallucinations was also unlike the way true psychotics experience them, because they hear familiar voices that are an indistinguishable part of their reality. The witness did not believe defendant had a mental disorder; instead, that he suffered from three types of personality disorders: histrionic (displaying theatrically dramatic emotions), narcissistic, and borderline (i.e., unstable, impulsive, prone to making decisions on the basis of emotion rather than reason, and given to emotional extremes that include episodes of depression). These personality disorders might cause defendant to misperceive reality in ways to gratify his own needs or feed his self-esteem, but they do not give rise to hallucinations. Defendant's present account of the shooting was simply a "dramatic and theatrical expression of emotion" as an exercise in self-justification for acting on an impulse out of anger and resentment in response to the deprivations that the victim was exacting from him. It did not matter that defendant had a history of reporting hallucinations, because none of them were genuine; they were a function of his histrionic character. Although admitting he was not an expert, the forensic psychologist was familiar with the effects of psychotropic medications and did not think defendant's sedative could result in hallucinations.

*People v. Mains*, No. C067590, 2013 WL 836708 at **1-5 (3d Dist. Cal. Mar. 7, 2013).

After the California Court of Appeal affirmed his judgment of conviction, petitioner filed a petition for review in the California Supreme Court. Resp't's Lodg. Doc. entitled "Petition for Review, California Supreme Court, April 11, 2013." That petition was summarily denied. Resp't's Lodg. Doc. entitled "Order Denying Petition for Review, California Supreme Court, June 12, 2013."

Petitioner filed his federal habeas petition in this court on February 18, 2014. ECF No. 1. Respondent filed an answer on June 27, 2014, and petitioner filed a traverse on June 30, 2014 and July 9, 2014. ECF Nos. 28-30.

## II. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or

1    application of state law.  *See Wilson v. Corcoran*, 562 U.S. 1,5 (2010); *Estelle v. McGuire*, 502

2    U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

3         Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas

4    corpus relief:

5              An application for a writ of habeas corpus on behalf of a
              person in custody pursuant to the judgment of a State court shall not
6              be granted with respect to any claim that was adjudicated on the
              merits in State court proceedings unless the adjudication of the
7              claim -

8              (1) resulted in a decision that was contrary to, or involved
              an unreasonable application of, clearly established Federal law, as
9              determined by the Supreme Court of the United States; or

10             (2) resulted in a decision that was based on an unreasonable
              determination of the facts in light of the evidence presented in the
11             State court proceeding.

12        For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

13   holdings of the United States Supreme Court at the time of the last reasoned state court decision.

14   *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S.

15   ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v.*

16   *Taylor*, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining

17   what law is clearly established and whether a state court applied that law unreasonably."  *Stanley*,

18   633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit

19   precedent may not be "used to refine or sharpen a general principle of Supreme Court

20   jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced."  *Marshall*

21   *v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155

22   (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so

23   widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

24   be accepted as correct.  *Id.*  Further, where courts of appeals have diverged in their treatment of

25   an issue, it cannot be said that there is "clearly established Federal law" governing that issue.

26   *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

27        A state court decision is "contrary to" clearly established federal law if it applies a rule

28   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

1   precedent on "materially indistinguishable" facts.  *Price v. Vincent*, 538 U.S. 634, 640 (2003).

2   Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

3   writ if the state court identifies the correct governing legal principle from the Supreme Court's

4   decisions, but unreasonably applies that principle to the facts of the prisoner's case. [5]  *Lockyer v.*

5   *Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002

6   (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that

7   court concludes in its independent judgment that the relevant state-court decision applied clearly

8   established federal law erroneously or incorrectly.  Rather, that application must also be

9   unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v. Landrigan*, 550 U.S. 465, 473

10   (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

11   review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").

12   "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

13   'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v.*

14   *Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

15   Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

16   must show that the state court's ruling on the claim being presented in federal court was so

17   lacking in justification that there was an error well understood and comprehended in existing law

18   beyond any possibility for fairminded disagreement."  *Richter*, 562 U.S. at 103.

19        If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

20   court must conduct a de novo review of a habeas petitioner's claims.  *Delgadillo v. Woodford*,

21   527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

22   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

23   2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

24   de novo the constitutional issues raised.").

25   /////

26   _____

27        [5]   Under § 2254(d)(2), a state court decision based on a factual determination is not to be
     overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding."  *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*,

28   384 F.3d 628, 638 (9th Cir. 2004)).

1    The court looks to the last reasoned state court decision as the basis for the state court

2    judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If

3    the last reasoned state court decision adopts or substantially incorporates the reasoning from a

4    previous state court decision, this court may consider both decisions to ascertain the reasoning of

5    the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When

6    a federal claim has been presented to a state court and the state court has denied relief, it may be

7    presumed that the state court adjudicated the claim on the merits in the absence of any indication

8    or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. This presumption

9    may be overcome by a showing "there is reason to think some other explanation for the state

10   court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

11   Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

12   expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

13   the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___ U.S. ___, ___, 133

14   S.Ct. 1088, 1091 (2013).

15   Where the state court reaches a decision on the merits but provides no reasoning to

16   support its conclusion, a federal habeas court independently reviews the record to determine

17   whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v.*

18   *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo

19   review of the constitutional issue, but rather, the only method by which we can determine whether

20   a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no

21   reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

22   reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

23   A summary denial is presumed to be a denial on the merits of the petitioner's claims.

24   *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze

25   just what the state court did when it issued a summary denial, the federal court must review the

26   state court record to determine whether there was any "reasonable basis for the state court to deny

27   relief." *Richter*, 562 U.S. at 98. This court "must determine what arguments or theories ... could

28   have supported, the state court's decision; and then it must ask whether it is possible fairminded

11

1   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

2   decision of [the Supreme] Court." *Id.* at 102. The petitioner bears "the burden to demonstrate

3   that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d

4   925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98).

5       When it is clear, however, that a state court has not reached the merits of a petitioner's

6   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

7   habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

8   F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

9   **III. Petitioner's Claims**

10      **A. Exclusion of Evidence**

11          **1. <u>Petitioner's Arguments</u>**

12      In his first ground for relief, petitioner claims that "they conspired to unconstitutionally

13  deny a poison witness testimonie [sic] about arsenic." ECF No. 1 at 4.[6] Petitioner explains:

14          Also the last PD told me Id have to do any more filings on my own.
            Also the court used apprx. 3 judges & 2 D.A.s & 2 P.D.s &
15          conspiring to violate the court proceedings [sic] & also the
            defendant at that time was delusional & incorrjable [sic].
16

17  *Id.* In the traverse, petitioner states that his wife tried to poison him. He also states that when he

18  shot his wife he was "delusional." ECF No. 29 at 1. Petitioner explains that he still suffers from

19  the effects of the poisoning. *Id.* He asks, "why didn't the judge put the professional CSI poison

20  investigator on the stand to tell the truth about how much poison was in me at the time shot [sic]?

21  Why didn't the judge let new evidence come in, in the middle of my trial?" *Id.* Petitioner has

22  also filed numerous excerpts of the trial testimony in this matter and letters to the court explaining

23  his mental state at the time of the shooting. *See* ECF Nos. 8, 12-15, 19-22.

24      On appeal, petitioner claimed that the trial court violated his Fourteenth Amendment right

25  to a fair trial and his Sixth Amendment right to present a defense when it denied his request to

26  introduce evidence to support his theory that he shot his wife in unreasonable self-defense

27  _____

28          [6]  Page number citations such as this one are to the page numbers reflected on the court's
    CM/ECF system and not to page numbers assigned by the parties.

because he believed she was trying to poison him.  Petitioner described the excluded evidence as follows: (1) evidence that "testing of Mr. Mains's hair after arrest established that he had elevated amounts of antimony – a poison similar to arsenic but found in household cleaners, fire retardant, and metal;" (2) evidence that petitioner had told his daughter before the shooting that his wife was poisoning him; (3) evidence that petitioner told two of his friends that his wife had poisoned him in the past and was poisoning him still, and that he was afraid to eat the food she prepared for him; and (4) evidence that petitioner told the same two friends that he heard his wife was attempting to get a permit for a gun and that he and one of those friends "went to police to try and stop [her] from getting a gun."  Resp't's Lodg. Doc. entitled "Appellant's Opening Brief" (hereinafter AOB) at 55-57.  In his arguments before this court, petitioner appears to be narrowing his claim to the absence of trial testimony by a "poison witness . . . about arsenic." ECF No. 1 at 4.

### 2. State Court Decision

The California Court of Appeal denied petitioner's claims regarding the trial court's exclusion of evidence.  The court reasoned as follows:

> Defendant identifies three areas that the trial court precluded him from pursuing.  These include (1) an offer of proof that he had significantly elevated amounts of antimony in his hair at the time of his arrest (which abated thereafter), and that the symptoms he was reporting before the murder were consistent with antimony poisoning; (2) his daughter's testimony that before the murder he told her of his suspicions of being poisoned (to which she did not give credence); and (3) testimony from Arizona friends whom he told before the murder about his poisoning suspicions (to which they apparently did not give credence, either) and his fear of allowing the victim to obtain a gun.
>
> The court found the absence of any foundation connecting the presence of antimony in defendant's hair with an effect on his mental state, or with the claimed arachnicide sprayings (including the absence of any evidence of the active ingredients of the spray) as opposed to some other source for it,[7] and thus excluded the evidence.  The court sustained an objection to the daughter's testimony about defendant's poisoning suspicions; and allowed defendant to call one or the other of his friends to testify about defendant telling them that the victim menaced him with a knife,

---

[7]   Defense counsel had earlier asked defendant about antimony.  Defendant testified he was not familiar with the element, and was not aware of ever ingesting or handling it.

but excluded the remainder of their testimony as irrelevant. (Defendant never called either of the friends as a witness.)

Defendant argues it was prejudicially erroneous to exclude this evidence, because it corroborated his testimony that he had a genuine belief antedating the murder that the victim had been poisoning him, and was also in fear of her. He claims this was essential to his theory of unreasonable self-defense, and as a result the exclusion of the evidence was a violation of both state and federal law.

As defendant failed to provide any connection between the presence of antimony in his hair and a mechanism by which the victim could have exposed him to it (as opposed to some source other than the victim) - most importantly, that it is even an ingredient in the spider spray - the evidence did not provide any rational basis for the jury to infer any corroboration of the poisoning claims of defendant, and thus the trial court properly excluded it on that basis. (*California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 44–45; *People v. Berti* (1960) 178 Cal.App.2d 872, 876.) The lack of any expert testimony about the effect of antimony on mental functioning also was a proper basis for excluding the hair evidence in connection with defendant's mental state at the time of the murder.

Except to the extent they might rebut any claim of recent fabrication, defendant's hearsay statements to his daughter and friends regarding suspicions of poisoning were of minimal corroborative value at best, given that they did not accord his statements any credence. As for rebutting any inference of recent fabrication, their testimony in fact could equally give rise to the opposite inference, that defendant's testimony was simply part and parcel of a history of making unfounded accusations against the victim. That said, the testimony of his friend about their conversation on the day before the murder demonstrated to some extent that the purported poisonings were not merely a post hoc rationale.

The proposed testimony about defendant's fear of the victim's obtaining a gun would have been cumulative of the brother's testimony that the victim was found in possession of a gun on a previous occasion, and of the officer's testimony that defendant seemed genuinely in fear of the victim coming after him with a gun when reporting a violation of the restraining order against her. In addition, his daughter did testify that he had told her of at least one incident in which the victim tried to stab him, which would corroborate his claimed fear as well (as would the testimony he chose not to adduce from one of the two Arizona friends).

We thus conclude that none of this evidence was essential to the theory of the defense such that its erroneous exclusion must be harmless beyond a reasonable doubt. (*People v. Boyette* (2002) 29 Cal.4th 381, 427–428.) We also are of the opinion that it is not reasonably probable that admission of this evidence would have resulted in a more favorable outcome to defendant. As we have

14

found in his previous argument, the absence of any imminent peril or a reasonably contemporaneous provocation make any evidence of his subjective state of mind beside the point. As a result, we therefore do not need to decide the underlying question of whether the trial court abused its discretion in excluding the evidence.

*Mains*, 2013 WL 836708, at *8-9.

In other portions of its opinion, the Court of Appeal made the following relevant observations:

> *Reasonable* provocation for heat of passion is entirely absent: Both the victim's death threats and her brandishing of the knife to which defendant attested occurred before he *went off to the store and chose to return*, which are circumstances inconsistent with maintaining a state of heat of passion. Defendant also did not testify that he was *actually* in any state of provocation when he entered the studio and found his wife lying in bed, or when he came out of the bathroom with the gun and watched her sleeping on the bed. As for his claim of acting unreasonably in self-defense, he did not identify any *imminent* peril to which he was responding at the time he shot the sleeping victim, only his fear *and anger* at her past evil conduct toward him generally and that morning.

*Id.* *8 (emphasis in original).

> On appeal, defendant argues there was evidence from which a jury could have concluded that he suffered involuntary intoxication resulting in the wolf hallucination because there was a change to a new medication, the possible hallucinatory side effects of which he was not aware. Defendant *claims* he testified that "he mistakenly believed he was shooting a wolf because he was hallucinating" and thought it was attacking him. The record, however, is to the contrary.

> As we noted above, the PA testified that hallucinations are a potential result of *withdrawal* from the sedative, *not* from its use or abuse (as defendant incorrectly asserts repeatedly in his briefing). Although the ER doctor who evaluated defendant after the murder thought hallucinations were possible from an overdose, he did not observe defendant manifesting any signs that he was in fact hallucinating. This leaves only defendant's self-serving account of experiencing hallucinations, which the only psychiatric expert testifying at trial discredited as being inconsistent with authentic accounts of visual hallucinations. This is hardly substantial evidence of a hallucinated mistake of fact.

> * * *

> Moreover, defendant *never* testified that he feared an *attack* at the time of the murder from the wolf in the bed. Nor did he think he

15

1
2

> was shooting *only* at a wolf; he testified his wife's evil behavior toward him was *embodied* as a wolf, but he was nonetheless aware that the wolf was still his wife.

3  *Id.* at *6 (emphasis in original).

4    ### 3. <u>Applicable Law</u>

5    Criminal defendants have a constitutional right, implicit in the Sixth Amendment, to

6  present a defense; this right is "a fundamental element of due process of law." *Washington v.*

7  *Texas*, 388 U.S. 14, 19 (1967). *See also Crane v. Kentucky*, 476 U.S. 683, 687, 690 (1986);

8  *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Webb v. Texas*, 409 U.S. 95, 98 (1972).

9  Necessary to the realization of this right is the ability to present evidence, including the testimony

10  of witnesses. *Washington*, 388 U.S. at 19. However, the constitutional right to present a defense

11  is not absolute. *Alcala v. Woodford*, 334 F.3d 862, 877 (9th Cir. 2003). "Even relevant and

12  reliable evidence can be excluded when the state interest is strong." *Perry v. Rushen*, 713 F.2d

13  1447, 1450 (9th Cir. 1983).

14    State law rules excluding evidence from criminal trials do not abridge a criminal

15  defendant's right to present a defense unless they are "arbitrary" or "disproportionate to the

16  purposes they were designed to serve" and "infringe[s] upon a weighty interest of the accused."

17  *United States v. Scheffer*, 523 U.S. 303, 308 (1998). *See also Crane*, 476 U.S. at 689-91

18  (discussion of the tension between the discretion of state courts to exclude evidence at trial and

19  the federal constitutional right to "present a complete defense"); *Greene v. Lambert*, 288 F.3d

20  1081, 1090 (9th Cir. 2002). Further, a criminal defendant "does not have an unfettered right to

21  offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of

22  evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (quoting *Taylor v. Illinois*, 484 U.S. 400,

23  410 (1988)). In general, it has taken "unusually compelling circumstances ... to outweigh the

24  strong state interest in administration of its trials." *Perry*, 713 F.2d at 1452. "A habeas petitioner

25  bears a heavy burden in showing a due process violation based on an evidentiary decision."

26  *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005).

27  /////

28  /////

#### 4. **Analysis**

The trial record reflects that the trial judge held a California Evidence Code § 402 hearing at which petitioner's trial counsel examined a toxicologist regarding the level of antimony in petitioner's hair.[8]  Reporter's Transcript on Appeal (RT) at 1203-1220.  The trial court declined to admit the proffered evidence at trial because petitioner had failed to establish a link between the antimony and petitioner's mental state at the time of the killing.  *Id.* at 1223-25.  In relevant part, the trial judge described his reasoning as follows:

> THE COURT:  Your record is preserved.  Your record is made. You have made all of your arguments with regard to offers of proof. You have a 402 hearing in which your witnesses have testified. The other witnesses would simply provide chain of custody and actual analysis, but your record is there.
>
> The issue is basically one in which this Court is ruling on because the evidence you are offering for consideration by the jury is not relevant.  What you are arguing is that it's relevant solely as to your client's state of mind based on speculation.  I understand that.  I'm not going to allow it.[9]
>
> MS. SCHIAVO (petitioner's trial counsel): It's not just for that, your Honor, it goes to all of the mental defenses that negate first to second.

---

[8]   California Evidence Code § 402 provides:

> (a) When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article.
>
> (b) The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests.
>
> (c) A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute

[9]   In one of the partial trial transcripts filed by petitioner, petitioner has inserted the following handwritten note at this point in the transcript: "this is where our professional witness is not allowed to testify."  ECF No. 15 at 8.  It therefore appears that, in the instant petition, petitioner is challenging the trial court's refusal to allow the testimony of the toxicologist regarding the level of antimony in petitioner's hair.

17

THE COURT:  Ms. Schiavo, if it goes to the mental states, then you must have at least some expert who is going to be able to come in here and testify that antimony levels can correlate to mental status in some fashion.   I just asked your expert about that, and he indicated he was not aware of any studies that make such a correlation.  If you have some other expert who can make that offer, I'm happy to reconsider the matter, but as I have heard you say on a number of occasions, you don't have anybody who is going to say that.

MS. SCHIAVO:  I don't see any case law or anything that says I have to have an expert come in to state that.  And if there is one, I mean, I haven't found that.

THE COURT:  All right.  I understand the issue.  The ruling stands.

*Id.* at 1224-25.

As set forth above, the California Court of Appeal upheld the trial court's decision to exclude all of the evidence described by petitioner in his claim on appeal.  *Mains*, 2013 WL 836708 at *9.  With regard to the toxicologist, the court concluded, as the trial court had, that this evidence was irrelevant given the lack of evidence connecting the antimony in petitioner's hair with any actions by petitioner's wife, with spider spray, or with "mental functioning" in general. The appellate court also concluded that the proposed testimony from petitioner's daughter and friends was of minimal relevance or was cumulative of other testimony introduced at petitioner's trial.  Finally, the Court of Appeal concluded that any error in admitting evidence of petitioner's fear of his wife was harmless because petitioner failed to show "imminent peril" or "a reasonably contemporaneous provocation" at the time he shot his wife.  *Id.*

After a review of the record in this case, this court concludes that the decision by the state court on petitioner's claims of evidentiary error is not contrary to or an unreasonable application of the federal authorities cited above, nor is it based on an unreasonable determination of the facts.  With regard to the claim petitioner appears to be raising in this court – regarding the exclusion of the toxicologist's testimony – the conclusion of both the trial court and the state appellate court that this evidence was not relevant to petitioner's state of mind at the time of the shooting is fully supported by the trial record.  Petitioner was not able to establish that the antimony in his hair was caused by any actions of his wife, or that the antimony had any connection to issues regarding mental health.  *See, e.g.*, RT at 1219.  Under these circumstances,

18

1  the trial court's exclusion of this evidence did not violate petitioner's right to a fair trial or to

2  present a defense.

3      To the extent petitioner is also challenging the trial court's decision to exclude testimony

4  by petitioner's daughter and friends, he has failed to establish entitlement to relief.  The decision

5  of the California Court of Appeal on these claims is not contrary to or an unreasonable

6  application of federal law or the facts of this case.  Certainly, the decision of the California Court

7  of Appeal on the claims raised by petitioner on direct appeal, including petitioner's claim related

8  to testimony about the level of antimony in his hair, is not "so lacking in justification that there

9  was an error well understood and comprehended in existing law beyond any possibility for

10  fairminded disagreement."  *Richter*, 131 S.Ct. at 786-87.  Accordingly, petitioner is not entitled to

11  federal habeas relief on these claims.

12      **B. Petitioner's Sentence**

13      Petitioner was sentenced in this case to 25 years-to-life on the murder charge and a

14  consecutive sentence of 25 years-to-life for the gun use allegation, for a total sentence of 50

15  years-to-life in state prison.  Clerk's Transcript on Appeal (CT) at 664; RT at 2248.  Petitioner

16  appears to be raising a challenge to that sentence in his second and third claims for relief.

17      Petitioner's second ground for relief is stated, in full, as follows:

18
      Also w/ other case citations & in Victorville Superior a man named
19      Frank Edward shot a man w/ a 357 in back seat of car & wanted to
      sell a shotgun for $40 & he stated he just shot him & wasn't
20      because he wanted the shot gun.  Also if I can have a P.D. on this
      case & to sheapardize & cite other cases & plead 6 yrs.

21  ECF No. 1 at 4.  Petitioner's third ground for relief is stated as follows:

22
      If the court can appoint counsel & can file some & cite some case
23      laws.  Also w/ the Board of Parole & can cite any of these cases
      w/life & possibility to parole & some cases were paroled & treating
24      some one kind of equally & can have any relief & counsel to
      research other case & sent to court yearly.

25  *Id.* at 5.

26      With these two claims, petitioner appears to be arguing that his sentence is unfair when

27  compared to the sentences of other criminal defendants.  Petitioner's claims in this regard are

28  unexhausted; however, the court recommends that they be denied on the merits.  *See* 28 U.S.C.

1   § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits,

2   notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

3   State").[10]

4        Petitioner's challenge to his sentence essentially involves an interpretation of state

5   sentencing law.  As explained above, "it is not the province of a federal habeas court to reexamine

6   state court determinations on state law questions."  *Wilson v. Corcoran*, 562 U.S. 1, ___, 131 S.

7   Ct. 13, 16 (2010) (quoting *Estelle*, 502 U.S. at 67).  So long as a sentence imposed by a state

8   court "is not based on any proscribed federal grounds such as being cruel and unusual, racially or

9   ethnically motivated, or enhanced by indigency, the penalties for violation of state statutes are

10  matters of state concern."  *Makal v. State of Arizona*, 544 F.2d 1030, 1035 (9th Cir. 1976).  Thus,

11  "[a]bsent a showing of fundamental unfairness, a state court's misapplication of its own

12  sentencing laws does not justify federal habeas relief."  *Christian v. Rhode*, 41 F.3d 461, 469 (9th

13  Cir. 1994).  Petitioner has failed to demonstrate that the state court's imposition of a sentence of

14  50-years-to-life for first degree murder with use of a firearm was fundamentally unfair.

15       Nor is petitioner entitled to relief on a claim that his sentence of fifty years-to-life for first

16  degree murder constitutes cruel and unusual punishment, in violation of the Eighth Amendment

17  of the U.S. Constitution.  The United States Supreme Court has held that the Eighth Amendment

18  includes a "narrow proportionality principle" that applies to terms of imprisonment.  *See*

19  *Harmelin v. Michigan*, 501 U.S. 957, 996 (1991) (Kennedy, J., concurring).  *See also Taylor v.*

20  *Lewis*, 460 F.3d 1093, 1097 (9th Cir. 2006).  However, successful challenges in federal court to

21  the proportionality of particular sentences are "exceedingly rare."  *Solem v. Helm*, 463 U.S. 277,

22  289-90 (1983).  *See also Ramirez v. Castro*, 365 F.3d 755, 775 (9th Cir. 2004).  "The Eighth

23

24       [10]  Respondent construes petitioner's third claim for relief as a request for the

25  appointment of counsel to represent him before the parole board.  ECF No. 28 at 26.  As noted by respondent, any such claim is premature because petitioner will not be eligible for parole until he has served fifty years in prison.  *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568,

26  580-81 (1985) (a case that involves "contingent future events that may not occur as anticipated, or indeed may not occur at all" is not ripe for decision).  Accordingly, to the extent petitioner is

27  requesting the appointment of counsel at a future parole consideration hearing, his request should

28  be denied.

1   Amendment does not require strict proportionality between crime and sentence.  Rather, it forbids

2   only extreme sentences that are 'grossly disproportionate' to the crime."  *Harmelin*, 501 U.S. at

3   1001 (Kennedy, J., concurring) (citing *Solem*, 463 U.S. at 288, 303).  In *Lockyer v. Andrade*, the

4   United States Supreme Court held that it was not an unreasonable application of clearly

5   established federal law for the California Court of Appeal to affirm a "Three Strikes" sentence of

6   two consecutive 25 year-to-life imprisonment terms for a petty theft with a prior conviction

7   involving theft of $150.00 worth of videotapes.  *Andrade*, 538 U.S. at 75.  Similarly, the Supreme

8   Court has held that a "Three Strikes" sentence of 25 years-to-life in prison imposed pursuant to a

9   grand theft conviction involving the theft of three golf clubs from a pro shop was not grossly

10  disproportionate and did not violate the Eighth Amendment.  *Ewing v. California*, 538 U.S. 11,

11  29 (2003).

12      Petitioner has failed to show that his sentence falls within the type of "exceedingly rare"

13  circumstance that would support a finding that his sentence violates the Eighth Amendment.

14  Petitioner's sentence is certainly a significant penalty.  However, petitioner was convicted of

15  premeditated murder of his wife with use of a handgun.  In *Andrade*, the United States Supreme

16  Court upheld the same sentence for far less serious crimes than the crimes petitioner was

17  convicted of.  In *Harmelin*, the Supreme Court upheld a sentence of life without possibility of

18  parole for possessing a large quantity of cocaine.  *Harmelin*, 501 U.S. at 996.  And in *Rummel*,

19  the Supreme Court concluded that a sentence of life with the possibility of parole for obtaining

20  money by false pretenses did not constitute cruel and unusual punishment.  *Rummel*, 445 U.S. at

21  282.  In light of these decisions of the U.S. Supreme Court, it cannot be said that the sentence

22  imposed in petitioner's case was grossly disproportionate.  Accordingly, petitioner is not entitled

23  to federal habeas relief on his second and third claims.

24      **C. Copies**

25      In his final ground for relief, petitioner states: "If the U.S. court can make & keep filed

26  copies & sent copies & papers to the inmate."  ECF No. 1 at 5.  This statement does not state a

27  federal question and should be denied.  Petitioner is advised that all documents filed in this case

28  will remain on the court docket and that he will be served with copies of filed documents.

**IV. Conclusion**

For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  October 20, 2016.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE